IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  05-cv-00353-LTB-PAC

WENDELL TODD JONES,

      Applicant,

v.

AL ESTEP, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

      Respondents.

_____

RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

Patricia A. Coan, United States Magistrate Judge

      The matter before the court is an Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. §2254 filed by Applicant Wendell Todd Jones on February 25, 2005. Respondents have answered the Application and Mr. Jones has filed a Traverse.  A May 18, 2005 Order of Reference referred the Application to the undersigned for recommended disposition.

I.

      Applicant was convicted by a Denver District Court jury in 1989 of two counts of first degree murder, attempted first degree murder, first degree kidnapping and conspiracy. He is serving two consecutive life sentences, plus forty-eight years, with the Colorado Department of Corrections.

      The following is a summary of the evidence at Applicant's trial, as derived from the portions of the state court record filed in this court on December 12, 2005 and from copies

of the supplemental state court record filed by Applicant, at the court's request, on February 10, 2006.[1]  On the afternoon of January 4, 1988, Applicant was at an apartment in Denver's Capitol Hill District ("the Capitol Hill apartment") with George Shanklin, his co-defendant, and Wardell Reed, whom Applicant had never met before. (R.[2] Vol. 9, Testimony of Wardell Reed) Shanklin told Reed that Applicant was his cousin from East St. Louis.  (*Id.*)  Reed testified that he agreed to sell cocaine for Shanklin and that Shanklin gave Applicant some cocaine after introducing them. (R. Vol. 9, Reed testimony) According to Reed, he and Applicant then left the apartment in Shanklin's car, a gray Ford Fiesta, and drove to a shopping center in northeast Denver where they picked up Royce Reagor. (*Id.*; Testimony of Royce Reagor, R. Vol. 9)  Reagor did not know Reed or the Applicant. (R. Vol. 9, Reagor testimony) Applicant, who had introduced himself to Reed as "Doc," gave Reed $150 worth of cocaine and dropped Reed off at a house on Holly Street to sell it.  (*Id.*; R. Vol. 9, Reed testimony) Jones told Reed to return to the shopping center after he sold the cocaine.  (R. Vol. 9, Reagor testimony; Reed testimony) Applicant and Reagor then drove to a check cashing business so that Reagor could get some money to buy crack cocaine from Jones.  (*Id.*, Reagor testimony)   Reagor purchased cocaine from Applicant and smoked some of it.  (*Id.*)  The two men returned to the shopping center where Reagor helped Applicant sell cocaine.  (*Id.*)

---

[1]After reviewing the volumes of the trial transcripts filed in this court on December 12, 2005, the undersigned ascertained that several volumes of Applicant's trial transcripts were missing.  The Denver District Court advised the undersigned's staff that the transcripts were also missing from the state trial court's records.  I thereafter directed the Applicant to provide the court with a copy of the missing transcripts from his personal copy of the state trial transcripts.  Applicant was reimbursed by the court for his copying and postage costs associated with filing the supplemental state court record.

[2]"R" refers to copies of the state court record filed on December 12, 2005.

Later, Applicant and Reagor drove back to the Holly Street house to look for Reed, but Reed was not there.  (R. Vol. 9, Reagor testimony; Testimony of Derrick Darby) Applicant and Reagor made another unsuccessful attempt to locate Reed at the shopping center, and then drove to the alley behind the Holly Street house where Jones pulled a .38 revolver on Reagor while they were sitting in the car. (*Id.*, Reagor testimony) Applicant demanded that Reagor give Applicant all of his money.  (*Id.*)  Applicant then forced Reagor, at gunpoint, to guide Applicant in driving to the Capitol Hill apartment so that Reagor could explain to Applicant's "boss" what had happened to the money Reed made selling the cocaine Shanklin gave  Reed earlier that day.  (*Id.*)  According to Reagor, Applicant believed that Reed had cheated Applicant on the drug deal, and that Reagor was involved.  (*Id.*)

Reagor testified that when they arrived at the Capitol Hill apartment, Applicant told Reagor to lie on the floor and went to make a phone call in the bedroom.  (R. Vol. 9, Reagor testimony)  Shanklin, whom Reagor recognized as "Baby George," came over shortly thereafter and asked Applicant, whom he referred to as "Doc," what was going on. (*Id.*)  After Applicant told Shanklin what had happened, Shanklin opened his jacket and pulled out two guns that Reagor described as a machine gun and a .357 or .44 magnum revolver.  (*Id.*)  Shanklin  said that they were going back to the Holly Street house to find his money and to look for Reed.  (*Id.*)  According to Reagor, Shanklin also stated that "we're going to make it look like you [Reagor] did it and we will kill everybody in the house." (*Id.*)

Applicant, Shanklin and Reagor then left the Capitol Hill apartment and got into the

3

gray Ford Fiesta. (R. Vol. 9, Reagor testimony)  Reagor sat in the front passenger seat, Applicant sat behind Reagor armed with the machine gun, and Shanklin drove. (*Id.*) When they arrived at the Holly Street house, Applicant pointed the machine gun at Reagor's back as they walked up to the front door. (*Id.*) While Applicant and Shanklin were attempting to persuade the occupants of the house to let them inside, Reagor fled and ran down the street. (*Id.*) Reagor heard gunshots as he was running away. (*Id.*) Reagor went to the house of a resident who lived approximately a block away and asked the resident to summon the police so Reagor could report what had happened. (*Id.*; R. Vol. 9, Benjamin Gresham testimony)

Derrick Darby testified that in the early evening hours of January 4, 1988, he was at the Holly Street house visiting his friend, Robert Frazier, when Frazier responded to a knock on the door. (R. Vol. 9, Testimony of Derrick Darby) Shanklin, whom Darby recognized as "Baby George," a regular patron of the club where Darby used to work, rushed into the house and said "where is that mother f-----," referring to Reed. (*Id.*) Darby and Frazier replied that Reed was not there. (*Id.*) Shanklin then hit Frazier in the face with his forearm. (*Id.*) Applicant, who had been standing at the front door, came into the house with an "Uzi" and told Darby to lie on the ground. (*Id.*) As Darby was getting down on the floor, he was shot in the neck. (*Id.*) Darby heard Shanklin say "did you kill him?" (*Id.*) Darby then heard four other shots in rapid succession before he was shot once more in the shoulder. (*Id.*) Applicant and Shanklin left the house after Darby was shot the second time. (*Id.*) Darby further testified that Reed had visited the Holly Street house earlier that afternoon and asked Darby if he wanted to buy some cocaine, but Darby

4

declined.  (R. Vol. 9, Darby testimony)   Shortly thereafter, an individual whom Darby later identified as Applicant, the person who shot him, came to the door looking for Reed.  (*Id.*) Darby told Applicant that Reed had just left.  (*Id.*)  Applicant seemed upset and drove off in what Darby described as a silver Ford Escort.  (*Id.*)  The shootings occurred a short time later.  (*Id.*)

The coroner testified that Frazier and Sheila Gamble, the other persons present in the house, died from gunshot wounds.  (R. Vol.  8, Testimony of George Thomas)

Reed testified that he returned to the Holly Street house after selling the cocaine Applicant had given him and was approaching the back door when he heard someone inside asking for him, followed by gunshots.  (R. Vol. 9, Reed Testimony)   Reed left the house immediately without entering.   (*Id.*)

John and Charlesetta Woods, residents of a duplex next door to the Holly Street house, testified that at approximately 7:00 p.m. on January 4, 1988, they saw three black men going up the front walk.  (R. Vol. 8, Testimony of John and Charlesetta Woods)   The Woods saw one man break away and run south on Holly Street, and heard one of the men standing at the front door saying, repeatedly, "where did he go?"  (*Id.*)  The Woods then heard the two men banging on the door at the house and shouting at whoever was inside. (*Id.*)  After the occupants let the men into the house, the Woods heard some shouting and then gunshots.  (*Id.*) The Woods testified that they saw two men run out of the house and flee north after the shots were fired.  (*Id.*)

Dana Johnson testified that she met the Applicant and co-defendant Shanklin in East St. Louis, Illinois sometime before Christmas 1987 outside of a shopping mall. (Supp.

R.[3] Vol. 13, Testimony of Dana Johnson) Shanklin introduced himself to her and introduced Applicant as "Wendell." (*Id.*)   Shanklin told her that he was visiting from Colorado.  (*Id.*)  Johnson and a friend of hers then drove around with Shanklin and Applicant for approximately two hours in Shanklin's car.  (*Id.*)  During that time, she learned that Applicant's nickname was "Doc."  (*Id.*)  When Shanklin dropped her off, they exchanged telephone numbers and Shanklin told her that he and the Applicant were going to Colorado the next day.  (*Id.*)  Shanklin telephoned Johnson after he returned to Colorado and arranged for her to come to Colorado to visit him.  (*Id.*)  Johnson flew to Denver to visit Shanklin on January 4, 1988.  (*Id.*) She testified that Shanklin and Reed picked her up at Stapleton Airport and that the three of them drove to the Capitol Hill apartment where Applicant was present with two other women. (*Id.*)   She hugged Applicant, whom she recognized as the man she met with Shanklin in East St. Louis. (*Id.*) After a while, Johnson, Shanklin and Applicant drove to Shanklin's house on Quebec Street.  (*Id.*) Jones left shortly thereafter to  "make some money." (*Id.*)  According to Johnson, Shanklin received a telephone call from Jones later that afternoon.  (*Id.*) Shanklin relayed to her that Applicant was angry because Reed had taken some money and drugs from Applicant. (*Id.*)  Shanklin then left to meet Jones. (*Id.*)  Johnson testified that Shanklin returned to the Quebec Street house in the Ford Fiesta approximately forty-five minutes later acting "hyper." (*Id.*)  Shanklin and Johnson drove to the Capitol Hill apartment in Shanklin's Buick and he loaded a telephone, some luggage and some boxes

---

[3]References to "Supp.R." are to the copies of the missing trial transcripts Applicant filed on February 10. 2006.

into the car. (*Id.*)  When Shanklin and Johnson returned to the Quebec Street house, Applicant was there. (*Id.*)  Applicant packed his belongings and Shanklin  and Johnson led Applicant to Interstate 70. (*Id.*) Applicant headed east on the interstate in Shanklin's Buick, while Shanklin and Johnson returned to the Quebec Street house. (*Id.*)

Johnson further testified that Shanklin left the house the morning after the shootings to go to an appointment. (Supp.R. Vol. 11, Johnson testimony) He telephoned Johnson and asked her to wipe the Ford Fiesta clean of fingerprints and to remove the license plates. (*Id.*)  Shanklin told Johnson that he was trying to "cover up" for Wendell. (*Id.*) When Shanklin returned, he washed the car again and removed the plates because Johnson was unable to do so. (*Id.*)  After Shanklin received a telephone call notifying him that he was wanted for murder, Shanklin told Johnson that he had not killed anybody and that he was not going to jail for something he hadn't done. (*Id.*)  Shanklin also told Johnson that Applicant killed the two victims because Reed "ran off" with the drugs and money. (*Id.*)  Johnson returned to East St. Louis, Illinois the following day. (*Id.*) A few weeks later she saw a Buick in East St. Louis which she recognized as the one Applicant was driving when he left Denver after the shootings because of the tinted windows and the Colorado license plates. (*Id.*)

Sgt. Mark Koelker, an Illinois state police officer, arrested Applicant in East St. Louis, Illinois on February 2, 1988. (Supp.R. Vol. 10, Testimony of Mark Koelker) During a custodial interrogation, Applicant told Koelker that he had never been to Colorado before. (*Id.*)

Darby identified Applicant's co-defendant, George Shanklin, from police photo

arrays shown to him after the shootings, but could not identify the Applicant from police photographs.  (R.Vol. 9, Darby testimony) Darby did identify Applicant as one of the shooters at the preliminary hearing.  (*Id.*)   Reed and Reagor identified Applicant from a photographic line up approximately one month after the shootings.  (*Id.*, Reed and Reagor testimony)  Dana Johnson identified Applicant from police photographs shown to her in East St. Louis, Illinois on February 1, 1988. (Supp.R. Vol. 10, Koelker testimony)

Police were able to determine from the four spent bullets and four empty shell casings recovered from the scene that the four cartridge casings were consistent with having been fired from a 9mm automatic weapon (such as an Uzi), and that three of the four spent bullets were fired from the same firearm.  (Supp.R. Vol. 10, Testimony of Frank Kerber) The fourth spent bullet was discharged from a different gun.  (*Id.*)

Applicant was charged with two counts of first degree murder, criminal attempt to commit first degree murder, second degree kidnapping and conspiracy.  The defense theory in Applicant's case was that Applicant had been mistakenly identified by witnesses as the "Doc" who committed the shootings with co-defendant George Shanklin.  (R. Vols. 8, 11)  Applicant was convicted on all charges.

Applicant raises the following claims in his §2254 Application: (1)(a) that his Fourteenth Amendment due process right to a fair trial was violated by the trial court's admission of evidence of other crimes, wrongs and bad acts, and in-court and out-of-court identification testimony that was tainted by an unnecessarily suggestive out-of-court identification procedure; (b) that trial counsel was constitutionally ineffective in failing to object to the admission of that evidence at trial; and, (c) that state post conviction counsel

8

was constitutionally ineffective in failing to raise the due process claims on appeal in Applicant's first post conviction proceeding; (2) that his Fourteenth Amendment due process right to a fair trial and his Sixth Amendment confrontation rights were violated when the trial court restricted his cross examination of key prosecution witness Royce Reagor; (3) that Applicant's due process rights were violated when he received an inadequate advisement of his right to testify in his own defense; (4) that he was denied his Sixth Amendment right to effective assistance of counsel when trial counsel: (a) failed to exercise a peremptory challenge to excuse a biased juror; (b) stated in his opening statement that Applicant's co-defendant had already been convicted of the charged offenses; (c) failed to move for a mistrial after a police officer testified that Applicant exercised his right to remain silent and asked for an attorney during a police interrogation; (d) failed to object to the admission of hearsay testimony; and, (e) failed to conduct an adequate pretrial investigation and to prepare for trial; and (5) that Applicant's Fourteenth Amendment due process right to meaningful appellate review was violated by the trial court's failure to transmit the complete trial court record to the Colorado Court of Appeals during the second state post conviction proceeding.

II.

A.    <u>Timeliness of Application</u>

Respondents argue that the Application should be dismissed as untimely because it was filed outside the one year limitations period established by the Antiterrorism and Effective Death Penalty Act ("AEDPA"),  Pub. L. 104-132, 110 Stat. 1218 (effective April 24, 1996).

9

Normally, a state prisoner is required to file his federal habeas petition within one year after his judgment of conviction becomes final "by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. §2244(d)(1)(A). For prisoners whose convictions were final before AEDPA's enactment, the statute commences on AEDPA's effective date, April 24, 1996. *Fisher v. Gibson*, 262 F.3d 1135, 1142 (10th Cir. 2001).

The one year period is tolled during the time a properly filed state post conviction motion is pending. 28 U.S.C. §2244(d)(2). A post conviction motion is pending from the date it is filed to the date the Colorado Supreme Court denies a timely-filed petition for certiorari review. *Barnett v. LeMaster*, 167 F.3d 1321, 1323 (10th Cir. 1999).

Because Applicant's conviction became final before April 24, 1996, he was required to file his federal habeas application on or before April 24, 1997, unless the one-year period was tolled due to the pendency of state post conviction motions. The record reflects that Applicant's first post conviction motion was pending until November 22, 1999 when the Colorado Supreme Court denied certiorari review. The statute then ran for 343 days until Applicant filed his second state post conviction motion on November 6, 2000. That motion was pending until the Colorado Supreme Court denied certiorari review on January 24, 2005. The statute then ran sixteen days until February 10, 2005, when Applicant gave the Application to prison officials for mailing.[4] *See* March 3, 2005 Order to Show Cause, at 3 (deeming this action commenced on February 10, 2005, the date the

---

[4]Under the prisoner mailbox rule of *Houston v. Lack*, 487 U.S. 266, 270 (1988), a *pro se* prisoner's federal habeas application is deemed filed on the date he delivers the pleading to prison officials for mailing.

10

Application was signed and "presumably mailed"); Application, at 9. Accordingly, only 359 days elapsed on the AEDPA time clock before Mr. Jones filed his §2254 Application. I recommend a finding that the Application is timely.

B.     Exhaustion of State Remedies and Procedural Default

Respondents argue that the due process violations asserted in claims one and three should be dismissed because Applicant did not exhaust the claims in the state courts and the claims would be barred by a state procedural rule if Applicant attempted to exhaust them at this time.

A state prisoner ordinarily must exhaust available state court remedies prior to seeking federal habeas corpus relief. 28 U.S.C. §2254(b)(1)(A); *Rose v. Lundy*, 455 U.S. 509 (1982). The exhaustion requirement is satisfied if the federal claims have been presented properly to the highest state court, either on direct appeal or in a post conviction attack. *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999); *Dever v. Kansas State Penitentiary*, 36 F.3d 1531, 1534 (10th Cir. 1994).

I decline to address the complex issues of exhaustion and anticipatory procedural default presented in this case because I recommend, as discussed in detail below, that the entire Application be dismissed on the merits. *See* 28 U.S.C. §2254(b)(2); *Moore v. Schoeman*, 288 F.3d 1231, 1235 (10th Cir. 2002).

III.

The writ of habeas corpus is available to a person in custody pursuant to the judgment of a state court if his conviction was obtained "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §2254(a).

11

Under the AEDPA, federal habeas relief will not be granted on a constitutional claim adjudicated on the merits in the state courts unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. §2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. §2254(d)(2).

I review *de novo* claims that were not adjudicated on the merits in the state courts. *See Harris v. Poppell*, 411 F.3d 1189, 1195 (10th Cir. 2005); *Terrentine v. Mullin*, 390 F.3d 1181, 1189 (10th Cir. 2004).

A.   Violation of Due Process by Admission of Evidence of Other Crimes, Wrongs or Acts and Identification Evidence Based on an Unnecessarily Suggestive Pre-trial Identification Procedure and Related Ineffective Assistance of Counsel Claims

1.   Due Process Claims

Applicant claims that the trial court's admission of police photographic arrays, mugshots of Applicant, and witness testimony about Applicant's prior bad acts violated his due process rights.[5]   Applicant also claims that his due process rights were violated by the trial court's admission of in-court and out-of-court identification testimony that was tainted by an unnecessarily suggestive out-of-court identification procedure.

Some of Applicant's due process claims implicate Colorado Rule of Evidence 404(b) which provides:

Evidence of other crimes, wrongs, or acts is not admissible to

---

[5]The §2254 Application does not provide the factual bases of these claims; however, because Applicant is *pro se*, I liberally construe the Application as incorporating all of the allegations made by Applicant in state post conviction proceedings.

> prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

However, it is not the province of the federal habeas court to question evidentiary rulings by the state courts unless the petitioner can show that "the rulings in question rendered the trial so fundamentally unfair as to constitute denial of federal constitutional rights." *Moore v. Marr*, 254 F.3d 1235, 1246 (10th Cir. 2001)(internal quotations and citation omitted); *see*, *also*, *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law").  A proceeding is fundamentally unfair under the Due Process Clause only if it is "'shocking to the universal sense of justice.'" *United States v. Tome*, 3 F.3d 342, 353 (10th Cir.1993) (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973) (internal quotation omitted)).

Because the state courts did not address the merits of Applicant's due process claims, I review those claims *de novo*.  *See Harris*, 411 F.3d at 1195.

        a.     <u>testimony about other wrongs or bad acts</u>

Applicant first claims that his due process rights were violated when the trial court admitted testimony from prosecution witnesses Felicia Tolbert, Phyllis Johnson, and Zina Williams about Applicant's other wrongs or bad acts.

The admission of evidence of other crimes, wrongs or acts violates the Fourteenth Amendment Due Process Clause if the probative value of such evidence is "greatly outweighed by the prejudice flowing from its admission." *Duvall v. Reynolds*,

13

139 F.3d 768, 787 (10th Cir. 1998)(quoting *Hopkinson v. Shillinger*, 866 F.2d 1185,

1197 (10th Cir. 1989)).

Felicia Tolbert, who lived next door to co-defendant Shanklin's Capitol Hill

apartment,  testified at Applicant's trial that she met Applicant in the company of co-

defendant Shanklin a few days before the shootings,  that Applicant was "rude," that

he "scared her," and "intimidated her," that Applicant asked her if she wanted to buy

some marijuana, and that he gave her a hard time about using the telephone in

Shanklin's apartment. (Supp.R. Vol. 10, Testimony of Felicia Tolbert)

Phyllis Johnson testified that she met "Doc," co-defendant Shanklin's cousin, at

a New Year's Eve party at her  apartment in Colorado Springs approximately four days

before the shootings.  (R. Vol. 10, Testimony of Phyllis Johnson, at 85-86) Johnson

stated that when she was introduced to "Doc," he told her that she did not need to

know his name because "he was into too much private stuff."  (*Id.*)  Johnson also

testified that some time that evening she made a sarcastic comment to "Doc," and his

response was that he would "slap [her]" if she didn't shut up.  (*Id.*) Johnson further

stated  that a verbal altercation occurred in the apartment building parking lot between

"Doc," co-defendant Shanklin and some other men after "Doc" asked to see a gun that

another man was showing off, and then acted like he was going to leave with it.  (*Id.*)

Johnson testified that Shanklin told "Doc" to give the gun back and after he did so,

words were exchanged and it appeared to Johnson that "they were about to shoot

each other." (*Id.*) At that point, either "Doc" or co-defendant Shanklin told the other

men: "I will pop my trunk because I have an Uzi and [another] gun in the car."  (*Id.*) At

14

Applicant's trial, Johnson could not identify Applicant as the "Doc" she met at the New Year's Eve party because she had consumed a large amount of alcohol that evening. (*Id.*)

Zina Williams testified that she was Phyllis Johnson's roommate in Colorado Springs, that she was present at the New Year's Eve party, and that during the party, co-defendant Shanklin's friend, who was introduced to her as "Randy," asked to see another man's gun and then walked out of the apartment with it. (Supp.R. Vol. 10, Williams testimony)  She could not hear the conversation that occurred between the men in the parking lot.  (*Id.*)

The testimony of Tolbert, Johnson and Williams was probative because it impeached Applicant's statements to Illinois police officers at the time of his arrest that he had never been to Colorado.  In addition, Johnson's testimony established that Applicant and co-defendant Shanklin were in possession of an automatic weapon a few days before the shootings.  The ballistics expert testified that the shell casings recovered from the scene were consistent with having been fired from an automatic weapon.

I recommend finding that any prejudicial effect of Tolbert's remarks about Applicant's behavior did not outweigh the probative value of her testimony. Moreover, Tolbert's statement that Applicant offered to sell her some marijuana was brief and was not emphasized by the prosecutor in opening or closing statements.  I further recommend finding that any prejudicial effect of Williams' testimony did not outweigh its probative value.

15

Johnson's statements that "Doc" threatened her and others with violence and that he was in possession of an automatic weapon are more damaging. However, even if the probative value of that testimony was outweighed by its prejudicial effect, Applicant is not entitled to federal habeas corpus relief unless the tainted evidence had a "substantial and injurious effect [on] the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The Supreme Court has instructed federal courts applying *Brecht* to review the state court record as whole – if the court has "grave doubt" about the influence of the offending evidence on the verdict, the court should treat the error as having a substantial and injurious effect. *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). "Grave doubt" exists when the record as a whole reflects that the matter is so evenly balanced that the court feels itself "in virtual equipoise" regarding the error's harmlessness. *Id.*

Phyllis Johnson could not identify Applicant as the person whom she was introduced to at the New Year's Eve party as "Doc" a few days before the shootings because she was too intoxicated at that time. Accordingly, I recommend finding that her testimony did not have a substantial and injurious effect on the jury's verdict.

Applicant's claim that his due process rights were violated when the trial court admitted testimony about Applicant's other wrongs or bad acts should be dismissed.

b.    unconstitutional pre-trial identification procedure

Applicant next contends that his due process rights were violated by the trial court's admission of in-court and out-of-court identification testimony that was tainted by an unnecessarily suggestive out-of-court identification procedure. Specifically,

16

Applicant argues that a police photographic array containing two photographs of the Applicant (People's Ex. 43 at Applicant's trial) was unduly suggestive because Applicant was more noticeable than the others.

To determine the constitutionality of a pretrial identification procedure, the court first considers whether the procedure was unnecessarily suggestive.  If so, the court weighs the corrupting influence against the reliability of the identification.  *Grubbs v. Hannigan*, 982 F.2d 1483, 1489-90 (10th Cir.1993). A pre-trial identification procedure violates due process only when the procedure is so unnecessarily suggestive that it is "conducive to irreparable mistaken identification." *Kirby v. Illinois*, 406 U.S. 682, 691, (1972).  The critical inquiry "is whether, under the totality of the circumstances, the identification was reliable." *Neil v. Biggers*, 409 U.S. 188, 198 (1972).

Convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside "if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).

The court is unable to determine whether the photographic array which contained two pictures of Applicant was unnecessarily suggestive because the array was not part of the state court record filed in this court.  The state trial court, after a hearing on the Applicant's motion to suppress, held that the array was not unduly suggestive because it contained black and white photographs of nine black males who were approximately the same age. (*See* January 18, 1989 Order contained in the state

17

court record filed in *Shanklin v. Ortiz*, United States District Court for the District of Colorado Civil Action No. 04-cv-00841-ZLW-PAC).  I will assume, without deciding, that the array was unnecessarily suggestive and proceed to analyze whether the witness identifications of Applicant as the perpetrator from those photographs were reliable under the totality of the circumstances.

I consider five factors in determining the reliability of a pre trial identification: the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.  *Neil*, 409 U.S. at 199-200; *see*, *also*, *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

Three prosecution witnesses were shown the photographic array: Derrick Darby, Royce Reagor and Wardell Reed.  Only Reagor and Reed made a positive identification of Applicant.[6] (R. Vol. 9, Darby testimony, at 18-19; R. Vol. 9, Reagor testimony, at 124-125; R. Vol. 10, Reed testimony, at 34-35)

Reagor identified both photographs of Applicant on February 2, 1988,

---

[6]Other prosecution witnesses were shown a different photographic line-up  –  People's Trial Ex. 44.  It is not clear from the record whether that line-up also contained two photographs of the Applicant. However, even if it did, the witnesses who viewed it did not positively identify the Applicant.  Rashone Martin made a tentative identification of Applicant more than one year after the crimes, in March 1989, but she testified at trial she was not certain that the man she identified was the man she met briefly in the company of Applicant's co-defendant one or two days prior to the shootings.  (R. Vol. 9, Martin testimony, at 195-201) Zina Williams also tentatively identified Applicant from the photographic array in March 1989, but she told police officers that she was not certain that he was the person whom she met at her apartment on December 31, 1987, four days prior to the shootings. (R. Vol. 10, Williams testimony, at 12-17) Moreover, neither Martin nor Williams made a postive identification of Applicant in court. (R.Vol. 9, Martin testimony, at 201; R.Vol. 10, Williams testimony, at 17)  Accordingly, Applicant cannot demonstrate that the admission of those witnesses' identification testimony rendered Applicant's trial fundamentally unfair.

approximately one month after the shootings.  (R. Vol. 9, Reagor testimony, at 125)

Reagor testified that he was with Applicant for at least two hours before the shootings

occurred. (R. Vol. 9, Reagor testimony, cross examination)  Reagor also stated that he

had smoked some crack cocaine while he and Applicant were selling drugs at the

shopping center, but that the effects of the drug lasted for only fifteen minutes. (*Id.*,

Reagor testimony, at 102, 168-171, 174).  Moreover, although Reagor originally

described Applicant incorrectly to the police as being taller than Reagor, Reagor's

testimony as a whole reflects that he had ample opportunity to observe the Applicant,

with whom he drove around for a couple of hours, made some drug sales, and who

pointed a gun at him for a significant period of time. I recommend finding that under

the totality of the circumstances, Reagor's identification of Applicant was sufficiently

reliable so that it did not create "a very substantial likelihood of irreparable

misidentification." *Manson*,  432 U.S. at 116.

Wardell Reed's out-of-court identification of Applicant is more troublesome.

Reed identified one picture of Applicant from the photographic array on February 2,

1988.  (R. Vol. 9, Reed testimony; R. Vol. 10, *id.*)  However, when police asked Reed

to pick the perpetrator out of a photo line-up a few weeks earlier, Reed identified

someone who was not the Applicant.  (R. Vol. 10, Reed testimony, cross examination).

 Reed and Officer Hildebrant testified that Reed was not certain that the man he

identified from a photograph in January 1988 was the Applicant; however, Hildebrant's

written report does not indicate that the identification was a tentative one. (Testimony

of Douglas Hildebrandt, Supp.R. Vol.11)  Reed did not provide a description of "Doc"

to the police.  (R.Vol. 10, Reed testimony, cross examination)  Reed spent

approximately one hour in the Applicant's company the day of the shootings at the co-

defendant's Capitol Hill apartment and in a car driven by Applicant.  (R. Vols. 9 and

10, Reed testimony)

Even if Reed's February 2, 1988 identification of Applicant from the photo array

was not sufficiently reliable so that the admission of testimony of Reed's in-court and

out-of-court identifications of Applicant at trial were unconstitutional, I recommend

finding that the identification evidence did not have a substantial and injurious effect

on the jury's verdict.  Reagor, the key prosecution witness, identified both of

Applicant's pictures in the photographic array and I have recommended a finding that

Reagor's in-court identification was reliable.  Reed's testimony about "Doc's" activities

in the hours before the shootings substantially corroborated Reagor's testimony.

Reed and Reagor did not know each other at the time of the murders.  Moreover,

Dana Johnson also made a positive identification of Reed from a different police photo

line-up.[7]  Her testimony substantially corroborates the testimony of Reagor and Reed

on facts critical to Applicant's convictions. Accordingly, I recommend finding that

Applicant is not entitled to federal habeas relief on his claim that his due process

rights were violated by the admission of Reed's out-of-court and in-court identification

of Applicant.  *See Satcher v. Pruett*, 126 F.3d 561, 567-68 (4th Cir. 1997)(applying

*Brecht* inquiry to habeas petitioner's challenge to witnesses' in-court identification and

concluding that evidence did not have a substantial and injurious effect on the jury's

---

[7]Applicant does not challenge Dana Johnson's out-of-court identification of him.

verdict in light of the other identification evidence at trial); *see, also, Kennaugh v. Miller*, 289 F.3d 36, 48 (2d Cir. 2002)(holding that even if witness' in-court identification of defendant/habeas petitioner should have been excluded, the admission of the testimony was harmless because there was sufficient independent evidence of the petitioner's guilt).

Applicant's claim that his due process rights were violated by the trial court's admission of in-court and out-of-court identification testimony that was tainted by an unnecessarily suggestive out-of-court identification procedure should be dismissed.

        c.    admission of mugshots and photo array
                  as evidence of prior criminal acts

Applicant next complains that his due process rights were violated by the admission of "unsanitized" mugshots of Applicant contained in the photographic array (People's Ex. 43), accompanied by police officer testimony that the photographs were taken before the commission of the crimes for which Applicant was being tried. Applicant argues that the mugshots, which contained police data that identified Applicant as being in police custody, and the officer's testimony about when those photographs were taken, conveyed to the jury that Applicant had a prior criminal record.

Again, the objectionable photographs are not before the court. In the People's response to Applicant's first state post-conviction motion, the People state that the photos were altered so that the police identification numbers were not visible. (*See* People's Brief in Opposition to Defendant's Motion to Vacate and Set Aside Judgment

and Conviction, filed February 8, 1995, at 23[8])  Apparently the only marks identifying

the pictures as police photographs were "yardstick measurements."  (*See* Applicant's

Brief Memorandum of Law in Support of Post Conviction Motion, filed October 27,

1994, at 7[9])

Illinois State Police Sgt. Mark Koelker testified that the photographs of

Applicant were taken in 1982 and 1987, before the murders for which Applicant was

on trial. (Supp.R. Vol. 10, Koelker testimony) On cross exam, defense counsel elicited

testimony from Koelker that one of the pictures was taken in Illinois on December 23,

1987, twelve days before the shootings in Denver.  (*Id.*)  Counsel also elicited

testimony from Koelker about Applicant's appearance in that photograph, specifically,

that Applicant had a full beard and a mustache.  (*Id.*)  Defense counsel referred to the

December 1987 police photograph of Applicant again in his closing argument to

emphasize to the jury that the picture clearly showed Applicant with a beard, but that

Dana Johnson did not describe Applicant as having a beard in interviews with police

officers in the month after the shootings.[10]  (R.Vol. 11, at 84)

Where police pictures of the defendant are not referred to at trial as "mugshots"

and all of the police data is removed, no due process violation results from their

exposure to the jury. S*ee Reiger v. Christenson*, 789 F.2d 1425, 1430 (9th Cir. 1986);

*Futrell v. Wyrick*, 716 F.2d 1207, 1208 (8th Cir. 1983).  Here, the photographs were not

---

[8]This document is contained in the state court record filed in *Shanklin v. Ortiz*, Civil Action No. 04-cv-00841-ZLW-PAC.

[9]*See* n.8, *supra.*

[10]See Supp.R.Vol. 11, cross examination of Dana Johnson.

referred to as "mugshots," and most, but not all, of the police date was removed. However, Sgt. Koelker  testified that the photographs had been taken by the Illinois police officers and sent to the Denver police department to be included with seven other pictures sent by Koelker in a photographic array.  Thus, the jurors had a reasonable basis to infer from the photographs that Applicant had a prior criminal record.

Notwithstanding, I recommend finding that the trial court's admission of the mugshot photographs did not render Applicant's trial fundamentally unfair. The only issue in Applicant's trial was identification.  The photographic array which included Applicant's photos was highly probative of the accuracy of key prosecution witness Reagor's initial identification and the reliability of his in-court identification.  Although the jury might have inferred from the police department's possession of Applicant's photographs that he had a criminal record, the prosecutor did not bolster that inference in any other way.  Moreover, defense counsel referred to the photograph taken of Applicant in December 1987 in his closing argument as part of the defense theory of misidentification.

In other habeas cases where the identity of the perpetrator was the central issue, federal courts have rejected habeas petitioners' claims that the introduction of mugshots violated the petitioners' due process rights.  *See United States ex rel. Bleimehl v. Cannon*, 525 F.2d 414 (7th Cir. 1975)(concluding that admission of police mug book which contained photograph of the petitioner did not violate due process because identification of the perpetrator was the key issue at trial and the photograph

of petitioner was the only basis of pretrial identification; thus, the relevance of the photograph outweighed any prejudicial effect); *Simmons v. Taylor*, 195 F.3d 346, 348 (8th Cir. 1999)(upholding state court's decision under AEDPA standard of review that the petitioner's due process rights were not violated when a police officer testified that photographs of petitioner which were shown to an undercover officer in a photographic line-up for pre-trial identification purposes were obtained from police records).

Accordingly, I recommend dismissal of Applicant's claim that the trial court's admission of police photographs taken of him in 1982 and 1987 violated his due process rights.

I also recommend dismissal of Applicant's claim that the trial court's admission of a mugshot of Applicant, taken by Illinois state law enforcement officers on February 6, 1988, while Applicant was detained in the St. Claire County, Illinois jail following his arrest for the Colorado shootings, violated Applicant's due process rights.[11]  (Supp.R. Vol. 11, Koelker testimony)  Because the jury was advised that the mugshot was taken in conjunction with Applicant's arrest on the charges for which he was being tried, the admission of the mugshot did not imply that Applicant had a prior criminal record. Applicant has failed to demonstrate an erroneous state law evidentiary ruling, much less a violation of his constitutional rights.

> d.    admission of evidence of an unrelated crime

Lastly, Applicant claims that he was denied a fair trial when the trial court admitted physical evidence and accompanying testimony about an unrelated shooting

---

[11]The mugshot was not included in the state court record transmitted to this court.

incident for which the Applicant was not charged.

During the defense case, defense counsel elicited testimony from witnesses in an effort to tie the perpetrator of a shooting at another location to the shootings at the Holly Street house.  (Supp.R.Vol. 11, Testimony of Terry Demmel)  The defense attempted to implicate a man named Dwayne "K.C." Toombs in both crimes.  (*Id.*)  The police had information that co-defendant Shanklin had an Uzi gun belonging to Dwayne Toombs in his car immediately before the Holly Street shootings occurred.  (*Id.*)  In the prosecution's rebuttal case, witnesses testified that forensic evidence recovered from the other crime scene showed that the ammunition used there could not have come from the same gun.  (Supp.R. Vol. 12, Testimony of David Quinona; Frank Kerber)

The evidence introduced in the prosecution's rebuttal case was not used to infer the Applicant's participation in the uncharged crime.  Instead, the evidence was offered to refute the defense's efforts to show that someone named Dwayne "K.C." Toombs may have committed the shootings for which Applicant was on trial.  Accordingly,  Applicant's due process claim should be dismissed.

      2.    <u>Ineffective Assistance of Counsel</u>

Applicant claims that his trial counsel was constitutionally ineffective in failing to object to the admission of other crimes, wrongs and bad acts evidence and to the admission of identification evidence.  Applicant also claims that state post conviction counsel was ineffective in failing to raise those claims on appeal of the trial court's denial of Applicant's first post conviction motion.

Applicant's trial counsel testified at the state post conviction hearing that he did not object to prosecution witnesses Felicia Tolbert and Phyllis Johnson's testimony about "Doc's" prior bad acts as a matter of trial strategy, consistent with the defense theory of misidentification.  (R. Vol. 13, Testimony of David Eisner) The defense theory was based primarily on the fact that Applicant told Illinois police officers when he was arrested that he could not have committed the crimes because he had never been to Colorado.  (*Id.*)

The CCA held, in the context of addressing Applicant's claim that his post conviction counsel had been ineffective in failing to raise an ineffective assistance of trial counsel claim on appeal, that trial counsel's failure to object to Phyllis Johnson's testimony[12] was a reasonable strategic decision because Johnson attributed the prior bad acts to someone named "Doc," but could not identify Applicant as "Doc" at Applicant's trial.  (*See* Respondents' Ex. K, *People v. Wendell T. Jones*, CCA Case No. 01CA1247 (decided August 12, 2004), at 4-5) The CCA also held that counsel's failure to object to Tolbert's testimony[13] did not result in any prejudice to Applicant because her testimony "was not particularly probative, if relevant at all."  (*Id.* at 5) The CCA thus concluded that post conviction counsel had not been constitutionally ineffective in failing to pursue a claim on appeal that trial counsel had been constitutionally ineffective in failing to object to the testimony discussed above.  (*Id.*)

Although the AEDPA deferential standard of review would normally apply to

---

[12]The substance of Phyllis Johnson's testimony is discussed in Section III.A.1.a, *supra.*

[13]The substance of Felicia Tolbert's testimony is discussed in Section III.A.1.a, *supra.*

Applicant's claim that was adjudicated on the merits by the CCA, I do not reach the merits analysis because Applicant's claim that his state postconviction counsel was ineffective in failing to raise certain issues on appeal is not cognizable on federal habeas corpus review.  There is no constitutional right to counsel in state post conviction proceedings.  *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991).

However, I do apply the AEDPA standard of review to Applicant's claim that trial counsel was constitutionally ineffective in failing to object to the admission of Felicia Tolbert and Phyllis Johnson's testimony about Applicant's prior bad acts because the CCA adjudicated the merits of that claim, albeit in the slightly different context of addressing the claim that state post conviction counsel was constitutionally ineffective in failing to raise the claim on appeal.

I recommend finding that the CCA's resolution of Applicant's claim was not contrary to, or an unreasonable application of *Strickland*, based on the same reasoning employed by the CCA in finding that counsel made a reasonable strategic decision in light of the defense theory of misidentification.

 I consider the remainder of Applicant's claim *de novo.*

I recommend finding that trial counsel was not constitutionally ineffective in failing to object to the admission of a police photographic array which contained two pictures of Applicant taken by the Illinois police in 1982 and 1987 before Applicant's arrest in conjunction with the Colorado shootings.  Trial counsel filed a motion to suppress the photographic array which the trial court denied.  (R. Vol. 13, Eisner testimony; January 18, 1989 Order contained in state court record filed in *Shanklin v.*

*Ortiz*, Civil Action No. 04-cv-00841-ZLW-PAC) Trial counsel was not required to make

a contemporaneous objection at trial to preserve the issue for appeal.  *See People v.*

*Breland*, 728 P.2d 763, 766 (Colo. 1986).

Finally, I recommend finding that trial counsel was not constitutionally

ineffective in failing to object to the admission of a police photograph of Applicant

taken at the time of Applicant's arrest for the Colorado shootings.  Trial counsel

testified at the state post conviction hearing that he did not object to the admission of

the photograph because the photograph showed the jury how Applicant looked at the

time of his arrest to impeach some of the prosecution witnesses' description about

"Doc's" height, facial hair, and hair style.  (R. Vol. 13, Eisner testimony) The admission

of the photograph was a reasonable strategic decision because it was relevant to the

defense theory of misidentification. Further, the photograph's admission was

accompanied by testimony that the picture was taken in conjunction with Applicant's

arrest on the charges for which he was on trial, so as not to imply to the jury that

Applicant had a prior criminal record.

Accordingly, Applicant's allegations of ineffective assistance of counsel in Claim

One should be dismissed.

B.      Violation of Sixth Amendment Confrontation Rights

Applicant next claims that his Sixth Amendment confrontation rights and his

Fourteenth Amendment due process right to a fair trial were violated when the trial

court restricted his cross examination of key prosecution witness Royce Reagor.[14]

The Sixth Amendment Confrontation Clause guarantees the accused in a criminal prosecution the right to confront the witnesses against him.  U.S. Const. amend. VI; *Delaware v. Van Arsdall*, 475 U.S. 673 (1986).  The main purpose of confrontation is "'*to secure for the opponent the opportunity of cross-examination.*'" *Davis v. Alaska* 415 U.S. 308, 315 (1974)(quoting 5 J. Wigmore, Evidence §1395, p. 123 (3d ed. 1940))(emphasis in original).  However, the Constitution does not prevent a trial judge from imposing any limits on cross examination; instead, trial judges "retain wide latitude. . . to impose reasonable limits . . . based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Van Arsdall*, 475 U.S. at 679.  "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (*per curiam*) (emphasis in original).

During defense counsel's cross examination of Royce Reagor, counsel elicited testimony that: Reagor was serving a sentence for criminal trespass because he violated his probation by possessing marijuana at the time of Applicant's trial; that

---

[14]I note that Applicant also claimed in the state post conviction proceedings that his Sixth Amendment confrontation rights were violated by the admission of Dana Johnson's hearsay testimony about statements which co-defendant Shanklin allegedly made to her that implicated Applicant in the shootings.  *See* Brief Memorandum of Law in Support of Post Conviction Motion, filed October 27, 1994, at 13, contained in the state court record filed in *Shanklin v. Ortiz*, Civil Action No. 04-cv-00841-ZLW-PAC.  However, because Applicant does not raise that claim in his federal habeas petition, I do not address it.

Reagor regularly used and sold crack cocaine at the time of the shootings; Reagor lied at co-defendant Shanklin's trial when he testified that he did not have a crack habit; and, that Reagor lied to the police on two occasions.  (R. Vol. 9, Reagor testimony) Counsel also established that Reagor's testimony at co-defendant Shanklin's trial about the disposition of harassment and reckless endangerment charges filed against Reagor in another case was of questionable veracity.  (*Id.*)

Applicant asserts that he was denied his right to effective cross examination of Reagor when the court precluded defense counsel from questioning Reagor about an incident that occurred in a state criminal case filed against Reagor where Reagor was to be remanded into custody by a judge, but instead, Reagor fled the courtroom.  (R. Vol. 9, Reagor testimony) The trial court ruled that Reagor's fleeing the courtroom in an unrelated case was not relevant to the witness' credibility.  (*Id.*)

The CCA held that Applicant's constitutional confrontation rights had not been violated because defense counsel was effectively able to attack Reagor's credibility. (*See People v. Wendell T. Jones*, CCA Case No. 96-CA-1935 (decided December 17, 1998), Respondents' Ex. D, at 5-6) I recommend finding that the CCA's decision upholding the trial court's ruling was not contrary to, or an unreasonable application of, governing Supreme Court law.  The record shows that defense counsel made a strong attack on Reagor's credibility.  The trial court's foreclosure of one avenue of cross examination, which resulted in the exclusion of evidence which, at best, was only marginally relevant to the witness' credibility, does not amount to a constitutional violation.  Accordingly, Applicant's confrontation rights claim should be dismissed.

C.      Inadequate Advisement of Right to Testify

Applicant asserts in claim three that the trial court did not adequately advise him of his constitutional right to testify in his own defense.  The crux of this claim is that the trial court failed to advise Applicant that the prosecution could not use Applicant's silence and request for counsel during a custodial interrogation following his arrest for impeachment purposes. Applicant asserts that the alleged inadequate advisement caused him to "g[i]ve up his right to testify in order to not be penalized for having exercised his right to counsel and silence during questioning." (Application, at 6)

Because Applicant's claim was not adjudicated on the merits in the state courts, I address the claim *de novo*.  *See Harris*, 411 F.3d at 1195.

A criminal defendant has a fundamental constitutional right to testify in his own behalf at trial. *Rock v. Arkansas*, 483 U.S. 44, 49-52 (1987).   However, the trial court has no obligation to inquire into a defendant's decision not to testify, absent a showing that defendant did not make the decision not to testify, or that defendant and his attorney disagreed on whether defendant should take the stand.  *United States v. Janoe*, 720 F.2d 1156, 1161 (10th Cir. 1983); *see*, *also, Brown v. Artuz*, 124 F.3d 73, 78-79 (2d Cir.1997)(holding that trial courts are not obliged to inform a defendant of his right to testify and to inquire about a waiver of that right); *United States v. Pennycoke*, 65 F.3d 9,12 (3rd Cir. 1995)(absent exceptional circumstances, trial court generally is not required to explain to a defendant the right to testify or to verify that the defendant's waiver of the right is voluntary); *United States v. Ortiz*, 82 F.3d 1066,

1069-70 and 1069 n.8 (D.C.Cir. 1996)(collecting cases).

Although the state trial court did not give Applicant a *Curtis*[15] advisement on the record, Applicant testified at his state post conviction hearing that the trial court advised him of his right to testify.  (R. Vol. 14, at 70-72; *see*, *also*, Supp.R. Vol. 12, at 10) The trial court questioned Applicant about his decision not to testify at the close of the defense case.  (Supp.R. Vol. 12, at 11) Applicant assured the court that he, not defense counsel, made the decision.  (*Id.*)  Applicant does not allege that he told the court at any time during his trial that he wanted to testify, or that he and defense counsel disagreed about whether Applicant should testify.  The trial court had no duty to inquire further about Applicant's decision not to testify under those circumstances. *Janoe*, 720 F.2d at 1161.  Accordingly, Applicant's claim should be dismissed.

D.    Ineffective Assistance of Counsel

Applicant claims that his Sixth Amendment right to effective assistance of counsel was violated when counsel: (1) failed to exercise a peremptory challenge to excuse a biased juror; (2) stated in his opening statement that Applicant's co-defendant had already been convicted of the charged offenses; (3) failed to move for a mistrial after a prosecution witness testified that Applicant exercised his right to remain silent and asked for an attorney during a police interrogation; (4) failed to object to the admission of hearsay testimony; and, (5) failed to conduct an adequate pretrial

---

[15]*People v. Curtis*, 681 P.2d 504, 514-15 (Colo. 1984)(holding that a defendant's waiver of his constitutional right to testify on his own behalf at a criminal trial must be voluntary, knowing and intelligent  and that the existence of an effective waiver should be ascertained by the trial court on the record).

investigation and to prepare for trial.

The Sixth Amendment entitles a criminal defendant to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). To establish that counsel was constitutionally ineffective, Applicant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced his defense. *Id.* at 687-88.

"Judicial scrutiny of counsel's performance must be highly deferential." *Strickland,* 466 U.S. at 689. There is a "strong presumption" that counsel's performance falls within the range of "reasonable professional assistance." *Id.* A federal habeas petitioner can overcome this presumption by showing that the challenged acts or omissions "were outside the wide range of professionally competent assistance" and were not sound strategy under the circumstances. *Id.* at 689-90.

To establish the prejudice prong of the *Strickland* inquiry, the petitioner must demonstrate a reasonable probability that, but for counsel's deficient performance, he would have been acquitted on some or all of the charges. *Strickland*, 466 U.S. at 694; *Foster v. Ward*, 182 F.3d 1177, 1184 (10th Cir. 1999). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694**.** Prejudice must be determined in light of the strength of the prosecution's case. *Id.* at 695-96.

A habeas petitioner must satisfy both prongs of the *Strickland* test to prevail on his ineffective assistance of counsel claim. *Id.* at 697.

1.    <u>failure to exercise peremptory challenge</u>

Applicant first claims that his Sixth Amendment right to effective assistance of counsel was violated when counsel failed to exercise a peremptory challenge to excuse a biased juror.

The Sixth Amendment guarantees a criminal defendant a fair trial, which means, in a case tried to a jury, "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982)(internal quotation marks omitted); see, *also, Irwin v. Doud*, 366 U.S. 717, 722 (1961)(stating that the right to a trial before a fair and impartial trier-of-fact "is a basic requirement of due process").

During voir dire proceedings, the following colloquy occurred between the court and prospective juror, Ms. Hudley, after the court advised the prospective jurors about the names of the police officers who were expected to testify in the case:

> THE COURT: Okay.  Any jurors know any of those witnesses?  Okay.  Mrs. Hudley?
>
> MS. HUDLEY: Yes.
>
> THE COURT: Who do you know?
>
> MS. HUDLEY: Sergeant Danny Yount.
>
> THE COURT: How do you know him?
>
> MS. HUDLEY: He was in the same class as my husband.
>
> THE COURT: Same class?
>
> MS. HUDLEY: Yes.

[THE PROSECUTOR:]  Her husband is Detective Hudley.

THE COURT: Okay.  The fact you know Sergeant Yount affect you one way or the other in this case?

MS. HUDLEY.  No, sir.

THE COURT: You could be a fair juror?

MS. HUDLEY: Yes.

THE COURT: All right. . .

(R. Vol. 7, at 16-17)

During voir dire by counsel, defense counsel asked Hudley if she would be biased against the Applicant because of her marital relationship with a police detective.  (R.Vol. 7, at 115-117)  Hudley responded that she "pretty much do[es] her own thinking" and that her's husband's occupation as a police detective would not affect her ability to be impartial.  (*Id.*)

On appeal of the trial court's order denying Applicant's first state post conviction motion, the CCA held that trial counsel's failure to exercise a peremptory challenge to excuse Hudley was not objectively unreasonable because the juror stated clearly that she could be impartial.  (*See* Respondents' Ex. D, at 8-9) The CCA further found that because the defense theory at trial was misidentification, trial counsel may also have made a reasonable strategic decision not to challenge prospective juror Hudley so that the other jurors would not think that the Applicant had anything to hide.  (*Id.*)

I recommend finding that the CCA's decision is not contrary to, or an unreasonable application of, Supreme Court law.  There is nothing in the exchange

between the court and Hudley, or between Hudley and defense counsel, to indicate that Hudley's assurances about her impartiality were not credible, nor has Applicant cited any other evidence to show that Hudley was actually biased against him. Moreover, the Supreme Court has never held that a presumption of bias exists where a prospective juror has a close relationship with a police officer so that the failure to excuse the juror violates the defendant's due process rights.

Accordingly, Applicant's claim should be dismissed.

2.      Counsel's Reference to Co-Defendant's Convictions

Applicant next claims that trial counsel was constitutionally ineffective when counsel commented during his opening statement that Applicant's co-defendant, George Shanklin, had already been convicted on the same murder charges for which Applicant was being tried and when counsel asked the court to take judicial notice of the co-defendant's prior convictions.  Defense counsel did not request, and the trial court did not give, a cautionary instruction to the jury about the limited purpose for which the evidence was to be considered.

"A co-defendant's conviction may not be used as substantive evidence of a defendant's guilt." *United States v. Whitney*, 229 F.3d 1296, 1304 (10th Cir. 2000) (quoting *United States v. Baez*, 703 F.2d 453, 455 (10th Cir.1983)). However, such evidence may be used to impeach a testifying co-defendant. *Whitney*, 229 F.3d at 1304; *see, also, United States v. Leach*, 918 F.2d 464, 467 n.4 (5th Cir. 1990); *United States v. Davis*, 838 F.2d 909, 917 (7th Cir. 1988). "Because a co-defendant's conviction has "potential for prejudice, cautionary instructions limiting the jury's use of

36

the guilty plea to permissible purposes are critical." *Whitney*, 229 F.3d at 1304.

Before trial, defense counsel requested and received a ruling that evidence of co-defendant Shanklin's convictions for the same offenses was inadmissible. (Respondents' Ex. D, at 10)  In Opening Statement, however, defense counsel argued that Shanklin's credibility would be an issue in the case and that Shanklin's statements would be admitted into evidence through the testimony of Dana Johnson.  (R. Vol. 8, at 21) Counsel then told the jury: "George Shanklin has felony convictions for drugs, for cocaine, menacing, and you know what?  He has murder convictions for this case where he was convicted? You have to decide what you want to believe . . . (*Id.*)

Defense counsel testified at the state post conviction hearing that the purpose of bringing the co-defendant's convictions to the jury's attention was to impeach the co-defendant's credibility because he anticipated that the prosecution was going to present evidence of the co-defendant's out-of-court statements implicating Applicant in the shootings.  (R.Vol. 13, at 79-80)  The defense strategy was also to inform the jurors that at least one of the perpetrators had been convicted of the murders so that the jurors might be more amenable to returning a not guilty verdict for Applicant if there was reasonable doubt about whether Applicant was the other perpetrator.  (*Id.*)

On appeal of the trial court's denial of Applicant's first state post conviction motion, the CCA held that Applicant's allegations failed to satisfy the first prong of *Strickland*.  (Respondents' Ex. D, at 10)   The CCA reasoned that because Applicant's theory at trial was that the co-defendant and someone known as "Doc" had committed the murders, it was plausible that the co-defendant would try to implicate defendant to

37

shift responsibility for the crimes. (*Id.*)  The CCA thus concluded that it was reasonable trial strategy for defense counsel to impeach the co-defendant with evidence of the co-defendant's earlier convictions for the same offenses. (*Id.*)

I first address Applicant's argument in the state post conviction proceedings that it was not professionally reasonable for counsel to inform the jury about Shanklin's convictions for the same offenses for purposes of impeachment because Shanklin's out-of-court statements, which were admitted through the testimony of Dana Johnson, were inadmissible.

At trial, counsel sought to impeach the following statements by co-defendant Shanklin, as testified to by Dana Johnson: (1) that Shanklin received a telephone call from Applicant the afternoon of the shootings and that Applicant had said that "Orlando" (Wardell Reed) "had taken $500 and some marijuana or cocaine"; (2) that the day after the shootings, Shanklin called her and told her to wipe down the car and that he was covering up for "Wendell"; (3) that Shanklin received a telephone call from his attorney advising Shanklin that he was wanted for murder and that Shanklin responded that he was not involved, that he was not going to jail for the crime, and that Wendell was responsible.

Before trial, the prosecutor advised the court that he intended to question Dana Johnson about statements made to her by co-defendant Shanklin. (*See* quoted excerpts from trial record contained in Applicant's Brief in Support of Motion Under C.R.CR.P 35(C), filed October 28, 1994 in Denver District Court Case No. 88-CR-707,

at 9[16])  Defense counsel did not object and stated to the court his belief that co-conspirator statements "can come in up until the point of arrest, but any statements after his arrest certainly are no longer in furtherance of any conspiracy; after Mr. [George] Shanklin's arrest." (*Id.*)

Applicant argued in his first state post conviction motion that trial counsel was constitutionally ineffective in failing to object to the hearsay statements.[17] The CCA held that statements made by the Applicant were properly admitted as admissions by a party opponent under C.R.E. 801(d)(2)(A).  (Respondent's Ex. D, at 13) The CCA further held, however, that there was an insufficient evidentiary foundation laid to authorize admission of co-defendant Shanklin's statements under the co-conspirator exception to the hearsay rule, C.R.E. 801(d)(2)(E).[18]  (*Id.*)

The record establishes that defense counsel believed that co-defendant Shanklin's statements to Dana Johnson were admissible under the co-conspirator exception to the hearsay rule.  Although the CCA held otherwise, that does not negate the fact that counsel's purpose in apprising the jury of co-defendant Shanklin's convictions for the same offenses was to impeach anticipated trial testimony about

---

[16]This document is contained in the state court record filed in *Shanklin v. Ortiz*, Civil Action No. 04-cv-00841-ZLW-PAC.

[17]Applicant also asserts that claim here. *See* Discussion Section III.D.4, *supra*.

[18]Under C.R.E. 801(d)(2)(E), statements made by a co-conspirator during the course and in furtherance of a conspiracy are admissible if there is some corroborative evidence, separate and apart from the statement itself, that establishes the evidentiary conditions for admissibility.  *People v. Montoya*, 753 P.2d 729, 736 (Colo. 1988). Statements made by a co-conspirator after the commission of a crime are not admissible without proof that there was also a conspiracy between the parties to continue to act in concert to cover up the crime.  *Blecha v. People*, 962 P.2d 931, 938 (Colo. 1998).  The CCA concluded that the prosecution failed to present evidence of a separate conspiracy between the parties to conceal the  crimes. (Respondents' Ex. D, at 14)

Shanklin's out-of-court statements.  Accordingly, even if counsel made a legal error in judgment about the admissibility of Shanklin's statements, Applicant cannot show, under *Strickland*, that counsel's conduct fell below an objective standard of reasonableness because counsel used the co-defendant's convictions for impeachment purposes only.  Accordingly, I recommend finding that the CCA's decision was not contrary to, or an unreasonable application of controlling Supreme Court law.

Moreover, Applicant has not shown a reasonable probability that the outcome of his trial would have been different if counsel had not informed the jury about co-defendant Shanklin's convictions for the same offenses and asked the court to take judicial notice of the convictions.  The testimony of the prosecution's key witnesses, Reagor, Darby, Johnson and Reed corroborated each other in significant areas about the activities of Applicant and co-defendant Shanklin on the day of the shootings. Reagor and Dana Johnson made positive, reliable pre-trial identifications of Applicant. Reagor testified that Applicant and Shanklin armed themselves with an automatic weapon and a revolver, drove Reagor to the Holly Street house, and that the shootings occurred just moments after Reagor was able to run away.  Testimony from residents who lived next door to the crime scene corroborated the statements of Reagor, Darby and Reed about what occurred at the time of the shootings. In addition, the shell casings recovered from the scene were consistent with having been fired from an automatic weapon.   Accordingly, Applicant's ineffective assistance of counsel claim should be dismissed.

3.      <u>Failure to Object to Testimony that Applicant Exercised his Constitutional Rights during a Custodial Interrogation</u>

Applicant also claims that his trial counsel was constitutionally ineffective when counsel failed to move for a mistrial after a police officer testified for the prosecution that Applicant exercised his right to remain silent and requested an attorney during a custodial interrogation.

At trial, Officer Mark Koelker testified that he interrogated Applicant for a few minutes following Applicant's arrest in East St. Louis, Missouri on February 4, 1988. Koelker stated that after questioning Applicant about his whereabouts on the night of the murders:

> [Applicant] then asked if he could call his lawyer and we advised him, "yes," he could.  He gave the name, I believe it's Joe Barthalamue, an attorney out of Belleville, and Captain Delaney personally knows this particular lawyer, the law firm he works with, and he started to dial the number for him.

> [Applicant] then asked what time it was, and it was after 5:00 and he stated that they would probably be closed; he would be out of the office, so he then asked if he could call his father.

(Supp.R.Vol. 10, Koelker testimony, at 152-53)

Defense counsel did not object during the officer's testimony; instead, counsel approached the bench after the conclusion of direct examination to object and to move for a mistrial. (Supp.R.Vol. 10, at 157) Counsel advised the court that he did not want to draw attention to the improper comment.  (*Id.*)  The trial court considered the objection to have been raised contemporaneously with the comment, over-ruled the objection and denied the motion for a mistrial. (*Id.*)

41

At the hearing on Applicant's state post conviction motion, Applicant's trial counsel testified that his objective at trial was to establish Applicant's cooperation with the police, to raise the implication that Applicant had nothing to hide.  (R. Vol. 13, Eisner testimony) Counsel thus chose not to raise an objection in front of the jury so as not to emphasize the fact that Applicant had requested an attorney after his arrest. (*Id.* at 74-75)

On appeal of the trial court's denial of Applicant's motion for post conviction relief, the CCA held that counsel's decision to delay the objection and motion for a mistrial to avoid calling the jury's attention to the testimony was reasonable trial strategy and did not support a claim for ineffective assistance of counsel. (Respondents' Ex. D, at 12)

I recommend finding that the CCA's resolution of Applicant's claim was not contrary to, or an unreasonable application of, *Strickland*.  Although "[i]t is impermissible to attempt to prove a defendant's guilt by pointing ominously to the fact that he has sought the assistance of counsel," *United States v. McDonald*, 620 F.2d 559, 564 (5th Cir.1980),[19] there is nothing in the record of Applicant's trial to show that the prosecution directed the jury's attention to the witness' brief reference to Applicant's exercise of his right to counsel, or that the comment was otherwise used by the prosecution as a means of inferring Applicant's guilt.  Counsel's decision not to

---

[19]*See, also*, *United States ex. rel. Macon v. Yeager*, 476 F.2d 613, 615  (3rd Cir. 1973)(holding that "a prosecutor's comment seeking to raise in the jurors' minds an inference of guilt from the defendant's [exercise of his constitutional right to counsel] constitutes a `penalty' on the free exercise of a constitutional right.")

raise an objection or to move for a mistrial in the presence of the jury was not

constitutionally deficient and constituted reasonable trial strategy.  Applicant's claim

should be dismissed.

       4.     <u>Failure to Object to Admission of Hearsay Testimony</u>

      Applicant next claims that trial counsel was constitutionally ineffective in failing

to object to the admission of prejudicial hearsay testimony from prosecution witnesses

Phyllis Johnson and Dana Johnson.

      As discussed previously, Phyllis Johnson testified that she met "Doc," co-

defendant Shanklin's cousin, at a New Year's Eve party at her apartment in Colorado

Springs approximately four days before the shootings, that a verbal altercation

occurred in the apartment building parking lot between "Doc," co-defendant Shanklin

and some other men, and that either "Doc" or co-defendant Shanklin told the other

men: "I will pop my trunk because I have an Uzi and [another] gun in the car." (R. Vol.

10, Phyllis Johnson testimony, at 85-88)

      I consider the ineffective assistance claim pertaining to Phyllis Johnson's

hearsay testimony *de novo* because the CCA did not adjudicate the claim on its merits.

I recommend finding that trial counsel's failure to object to Phyllis Johnson's testimony

was a reasonable strategic decision under *Strickland* in light of the defense theory at

trial that Applicant had been wrongly implicated in the murders and was not the person

whom prosecution witnesses knew as "Doc."  Moreover, Applicant was not prejudiced

by the hearsay statements because Johnson could not identify Applicant as the man

she met in the company of co-defendant Shanklin at the New Year's Eve party a few

days before the shootings who claimed to have an Uzi in the trunk of his car.

Dana Johnson testified that sometime during the afternoon of January 4, 1988, Shanklin received a telephone call from Applicant.  Johnson further testified that after Shanklin hung up the telephone, he told her that "Wendell" was mad and that "Wendell" had said that "Orlando" (Wardell Reed) had taken $500 and some marijuana or cocaine.   (Supp.R. Vol. 11, Johnson testimony) Shanklin then left the house and said that he was going to meet "Wendell." (*Id.*) Johnson further testified that the next day, Shanklin left the house early and then telephoned her and told her to wash down the Ford Fiesta and to wipe off the outside of the car, the steering wheel, the radio and the door handles, and to remove the license plates because he was trying to "cover up for Wendell." (*Id.*)  Johnson stated that after Shanklin came home and washed the car again himself, he received a telephone call from his attorney advising him that he was wanted for murder.  (*Id.*)  Shanklin's response was that "Wendell" had committed the murders, that he (Shanklin) had not been involved, and that he was not going to jail for a crime he did not commit. (*Id.*)

The CCA concluded, on appeal of the state trial court's order denying Applicant's first post conviction motion, that Johnson's testimony about the statements Applicant made was admissible under C.R.E. 801(d)(2)(A) because Applicant's statements were admissions by a party opponent, but that the statements made by co-defendant Shanklin were not admissible under the co-conspirator exception to the hearsay rule.  (Respondents' Ex. D, at 13-14) The CCA then found that even if trial counsel's failure to object to the inadmissible hearsay testimony fell below an objective

44

standard of reasonableness, Applicant had not been prejudiced by the admission of the testimony. (*Id.* at 15)

I recommend finding that the CCA's resolution of Applicant's claim was not contrary to, or an unreasonable application of, *Strickland*. As discussed in Section III.D.2, *supra*, there was substantial evidence of Applicant's guilt without the inadmissible hearsay testimony of Dana Johnson so that Applicant has failed to demonstrate a reasonable probability that the outcome of the proceeding would have been different if the inadmissible hearsay had been excluded. Accordingly, the CCA's conclusion that Applicant was not prejudiced by the admission of the testimony was not contrary to, or an unreasonable application of, *Strickland*. Applicant's ineffective assistance of counsel claim should be dismissed.

     5.     <u>Failure to Conduct Adequate Pretrial Investigation</u>
               <u>and to Prepare Adequate Defense</u>

Finally, Applicant claims that his trial counsel was ineffective in failing to retain an expert to testify about the effects of crack cocaine on an individual's ability to accurately perceive events. There was evidence at trial that two of the prosecution's key witnesses, Reagor and Darby, had used crack cocaine shortly before the shootings. (R. Vol. 9, Reagor testimony; R. Vol. 10, Reed testimony) Applicant argues that testimony from a toxicologist was crucial to his misidentification defense because expert testimony would have assisted the jury in understanding how crack cocaine might have impaired the witness' ability to accurately identify Applicant as one of the perpetrators. Applicant emphasizes that because the prosecution's case hinged on those witnesses' identifications, it was objectively unreasonable for counsel not to

45

call a toxicologist.

Applicant's trial counsel testified at the state post conviction hearing that he thought it sufficient to impugn the prosecution witnesses's credibility through aggressive cross examination about their drug use.  (R. Vol. 13, Eisner testimony) Counsel testified that he tried approximately thirty-five non capital homicide cases before Applicant's trial and had never used a toxicologist to impeach a witness' credibility.  (*Id.*) Counsel further stated that in his experience, juries were not receptive to expert testimony offered for the purpose of diminishing a defendant's culpability. (*Id.*)

On appeal of the trial court's order denying Applicant's motion for post conviction relief, the CCA rejected Applicant's claim because "defense counsel made an informed decision regarding trial strategy and concluded that such expert testimony would have been of questionable benefit."  (Respondents' Ex. D, at 16)

I recommend finding that the CCA's decision was not contrary to, or an unreasonable application of, *Strickland*.  Defense counsel's decision to attack the prosecution witnesses' testimony through cross examination rather than with a toxicologist was a reasonable strategic decision.

However, even if counsel should have retained a toxicologist, Applicant cannot show that he was prejudiced by counsel's failure to do so.  The record does not reflect that either Reagor or Darby was so heavily under the influence of crack cocaine that his ability to perceive events during the critical time period was impaired.   Reagor testified that he used crack every day or every other day at the time of the shootings

46

and that he had smoked crack once on the day that the crimes occurred. (R. Vol. 9, Reagor testimony)   Reagor also testified that "time passes a little bit fast when you're high," but that the effects of crack lasted only about fifteen minutes for him and did not make him hallucinate, fall asleep, or lose touch with his surroundings. (*Id.*)  The evidence about Darby's use of crack cocaine was conflicting.  Darby testified that he did not smoke any crack on the day of the crimes.  (R. Vol. 9, Darby testimony)  Reed testified that he watched Darby take one hit of crack that afternoon.  (R. Vol. 10, Reed testimony) The police officer who responded to the scene after the shootings testified that he spoke to Darby and that Darby appeared to be thinking clearly. (Supp.R. Vol. 11, Testimony of Daniel O'Shea)  Moreover, defense counsel argued in his closing argument that the credibility of Reagor and Darby was suspect because of their cocaine use.  (R. Vol. 11)   It is not apparent from the record that expert testimony would have bolstered Applicant's defense.  *See Cannon v. Mullin*, 383 F.3d 1152, 1165 (10th Cir. 2004)(rejecting habeas petitioner's claim that trial counsel was constitutionally ineffective in failing to call expert witnesses because Applicant had not shown that expert testimony would have been helpful to the defense).

Accordingly, Applicant's claim that counsel was constitutionally ineffective in failing to call a toxicologist at Applicant's trial should be dismissed.  Further, because Applicant does not set forth any other factual basis for his claim that counsel failed to conduct an adequate pretrial investigation, the claim should be dismissed in its entirety.

E.    Failure to Transmit Complete Trial Court Record

Finally, Applicant claims that his Fourteenth Amendment due process right to meaningful appellate review was violated by the trial court's failure to transmit the complete trial court record to the CCA.  Specifically, Applicant argued to the CCA in his second state post conviction proceeding that the missing trial transcripts which contained the testimony of Felicia Tolbert and Illinois state police officer Mark Koelker were necessary to rule on his claim that the trial court erred in admitting evidence of Applicant's other crimes, wrongs and bad acts without a limiting instruction. (Respondents' Ex. H, at 8)

The CCA declined to rule on Applicant's claim that missing transcripts containing testimony of Officer Mark Koelker regarding Applicant's prior criminality and the admission of mugshots of Applicant taken prior to his arrest for the Colorado shootings prejudiced Applicant's appeal because Applicant did not raise that claim in his second post conviction motion and therefore, the trial court did not have the opportunity to address it. (Respondents' Ex. K, at 7)

The CCA further held that Applicant's right to meaningful review had not been prejudiced by the missing trial transcripts containing Felicia Tolbert's testimony because Applicant had set forth the substance of the witness' testimony in his Opening Brief, including direct quotations from Applicant's own copy of the missing trial transcripts, and the CCA accepted the accuracy of Applicant's representations as to her testimony.  (Respondents' Ex. K, at 7)

Because the missing trial transcripts did not affect the CCA's disposition of

48

Applicant's second state post conviction appeal, Applicant has not shown that he was prejudiced by the missing trial transcripts, nor has he demonstrated that the CCA's resolution of his claim was contrary to, or an unreasonable application of, governing United States Supreme Court law.  Applicant's final due process claim should be dismissed.

IV.

For the reasons set forth above, it is

**RECOMMENDED** that the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. §2254 filed by Applicant Wendell Todd Jones on February 25, 2005 be **DENIED**. It is

**FURTHER RECOMMENDED** that the §2254 Application be **DISMISSED WITH PREJUDICE**.

Dated March 6, 2006.

BY THE COURT:

s/ Patricia A. Coan
PATRICIA A. COAN
United States Magistrate Judge